IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LOUIE IRA MENDEZ HAMMONDS,

        Petitioner,               No. CIV S-02-0540 MCE DAD P

    vs.

JOE McGRATH, Warden, et al.,

        Respondents.          FINDINGS & RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on charges of attempted first degree murder with personal use of a firearm and infliction of great bodily injury, with an enhancement for having served a prior prison term.  He seeks relief on the grounds that: (1) he received ineffective assistance of trial counsel; (2) the trial court erred in excluding evidence of third party culpability and in failing to limit expert testimony; and (3) his due process rights were violated by the trial court's decision to allow the wheelchair-bound victim to remain in the courtroom during trial.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

1

PROCEDURAL BACKGROUND

On April 15, 1996, a complaint was filed in the Sacramento County Superior and Municipal Court charging petitioner with attempted murder, in violation of California Penal Code §§ 667 and 187(a).  (Clerk's Transcript on Appeal (CT) at 7.)  It was also alleged that the offense was a serious felony, within the meaning of California Penal Code § 1192.7(c)(1); that petitioner personally used a firearm in the commission of the felony, within the meaning of California Penal Code § 12022.5(a); and that petitioner had suffered a prior felony conviction for which he had served a prison term, within the meaning of California Penal Code § 667.5(b).  (Id. at 7-8.)  On June 20, 1996, an amended complaint was filed which added an allegation that petitioner personally inflicted great bodily injury (paralysis) upon the victim, in violation of California Penal Code § 12022.7(b).  (Id. at 14-15.)  At the conclusion of the preliminary hearing, the complaint was deemed an information and was amended to allege that the attempted murder was accomplished with malice aforethought and with premeditation and deliberation.  (Id. at 91-92.)  Petitioner entered a plea of not guilty and denied all of the enhancement allegations.  (Id. at 18, 91-93.)

Jury trial commenced on July 15, 1997.  (Id. at 108.)  On August 5, 1997, petitioner's jury found him guilty of attempted first degree murder and also found that he personally used a firearm and inflicted great bodily injury.  (Id. at 186.)  The trial court found true the allegation that petitioner had served a prior prison term.  (Answer, Ex. 3 at 1.)  On October 3, 1997, petitioner was sentenced to an indeterminate life term of imprisonment with the possibility of parole for the attempted first degree murder conviction, a consecutive fifteen-year term for personal use of a firearm and infliction of great bodily injury, and a consecutive one-year term for the prior prison term enhancement.  (CT at 228.)

On October 3, 1997, petitioner filed a timely notice of appeal with the California Court of Appeal for the Third Appellate District.  (Id. at 230.)  The Court of Appeal affirmed petitioner's conviction in an unpublished opinion filed April 13, 1999.  (Answer, Ex. 3.)  On

1   approximately May 24, 1999, petitioner filed a petition for review in the California Supreme

2   Court. (Answer, Ex. 4.)  That petition was summarily denied by order dated August 11, 1999.

3   (Id.)

4           On June 30, 2000, petitioner filed a petition for writ of habeas corpus in the

5   Sacramento County Superior Court. (Answer, Ex. 5.)  That petition was denied in a reasoned

6   opinion dated August 24, 2000.  (Id.)  On September 29, 2000, petitioner filed a petition for writ

7   of habeas corpus in the California Court of Appeal.  (Answer, Ex. 6.)  That petition was

8   summarily denied by order dated October 12, 2000.  (Id.)  On November 14, 2000, petitioner

9   filed a petition for writ of habeas corpus in the California Supreme Court.  (Answer, Ex. 7.)  That

10  petition was also summarily denied by order dated March 28, 2001.  (Id.)  On April 3, 2001,

11  petitioner filed another petition for writ of habeas corpus in the California Court of Appeal.

12  (Answer, Ex. 8.)  That petition was dismissed at petitioner's request on April 12, 2001.  (Id.)  On

13  April 20, 2001, petitioner filed another petition for writ of habeas corpus in the Sacramento

14  Superior Court.  (Answer, Ex. 9.)  In an opinion dated May 22, 2001, that petition was denied on

15  the grounds that it was untimely and successive.  (Id.)  On July 18, 2001, petitioner filed another

16  petition for writ of habeas corpus in the California Supreme Court.  (Answer, Ex. 10.)  That

17  petition was denied with a citation to In re Clark, 5 Cal. 4th 750 (1993) by order dated January

18  29, 2002.  (Id.)[1]  Petitioner filed this federal habeas action on March 14, 2002.

19                          FACTUAL BACKGROUND[2]

20          Jesus Arturo Leyva worked as a bartender at Nicky's Bar.  He was
            working the night of March 31, 1996, when four people he did not
21          recognize came in.  They ordered drinks and went to the pool table.
            After a few minutes, one of the group handed Leyva a note and
22

23          [1]  Petitioner notifies the court that he also filed a petition for writ of habeas corpus in the
       California Court of Appeal on June 13, 2001, which was denied on June 14, 2001.  (Traverse at
24     4.)

25          [2]  The following summary is drawn from the opinion by the California Court of Appeal
       for the Third Appellate District (hereinafter Opinion), at pgs. 2-5, which is attached as Exhibit 3
26     to Respondents' Answer filed in this action on August 29, 2002.

asked for his boss, Nicky Diaz.  The note read: "Ernesto Salcedo

$1000,000 [sic] 209-476-6447 !!!!"  Leyva told him Diaz was not in and would not be in that night.

Later a man Leyva knew came in and ordered a beer.  Leyva went to the west side of the bar.  The next thing he remembered was hearing shots.  Leyva could not identify who shot him, but he recognized defendant as one of the men who came in.  He saw defendant dump his beer before the shooting.

Leyva suffered a spinal cord injury that left him paralyzed from the chest down.  Part of a finger was also shot off.  There were 15 casings found at the scene; they came from a .9 millimeter weapon.  One gun had fired all of them.

Several customers at the bar testified to the events that evening.  Fred Veevalu worked part-time as a bouncer at Nicky's.  He was not working that night.  He had a conversation with defendant during which defendant asked if the bartender was the owner.  Veevalu said no and asked why.  Defendant said he had matters to handle with the owner involving his family, his father.  The owner owed his father money.  Defendant said if he had to, he would shoot the bartender.  Veevalu did not take defendant seriously.

Later defendant got irritated.  He put on a red bandanna and poured his beer on the floor.  Veevalu heard about 15 shots.  Defendant was holding a gun, pointed it at Veevalu, and made eye contact.  Veevalu identified defendant as the shooter from a photographic lineup.

Craig Chavez also identified defendant as the shooter.  When he identified defendant's photo for the police, he said "he looks familiar," but knew it was the shooter.  Chavez claimed just before the shooting defendant said, "This is for Nicky," he fired and said, "This is for you," and fired again.

Rapheal Barrajas testified a guy in a red and black Chicago Bulls shirt with number 23 on it, poured his beer on the floor.  He thought that guy had a gun.  He heard the shots but did not see who fired them.  He could not identify the man in the Chicago Bulls shirt.

Edward Ane was at Nicky's that night playing pool.  He testified defendant said, "someone's gonna die tonight."  At one point he left the bar; when he returned he saw a gun cocked and took off running.  He identified defendant as the shooter, but did not see him with the gun.  He believed it was defendant.

These witnesses gave varying descriptions of the shooter.  Veevalu described him as 5'7" or 5'8" and wearing a USA basketball jersey

with number 23 on it.  He had told an officer the shooter was 5'11",
but that was wrong.  Chavez said the shooter wore a vest and an
earring, and had a goatee.  He recalled about a three-inch ponytail,
while defendant's hair was 15-18 inches long.  Ane testified
defendant wore a red tank top and a red bandanna.

Defendant's fingerprints were found on a beer bottle and a shot
glass.

Seven .9 millimeter rounds of Spear ammunition were found in a
kitchen drawer at defendant's residence.  Of the 15 casings found
at the bar, 13 were Spear ammunition.  A gun leaves tool marks on
the ammunition when it is fired or cycled and ejected from the gun.
One of the 7 rounds found at defendant's had feeder marks, but
they were insufficient to determine if the ammunition had been
cycled through the same gun that fired the 15 shots at the bar.

Nicky Diaz testified he found the note at the bar.  He had heard that
Ernesto Salcedo, Sr., had died five or six years earlier.  He had met
Salcedo, Jr., five years earlier.  There were no threats or hostility
from him.

Defendant testified he spent that day boating with friends, one of
whom was Ernesto Salcedo, Jr., known as Ernie or Junior.  After
boating Ernie's pager went off, he made a call, and then asked if
they wanted to go for a ride.  They went to Nicky's Bar; Ernie said
he knew the owner.  Ernie asked the bartender if Nicky was
around.  When the bartender said no, Ernie asked him to call Nicky
for him.

Ernie played pool and was loud and obnoxious.  Defendant tried to
calm him down.  Defendant noticed three men enter from the back
and nod to the bartender.  They went up to Ernie and began
questioning him with hostility.  Defendant tried to intervene.
Defendant said they should leave as the men were plotting.  He told
the rest of his friends they should leave and left the bar.  When no
one followed, defendant returned.  He got they keys to the van
from Ernie and left again.  He heard shots and Ernie came out;
defendant dove into the back of the van.  Ernie said, "all hell broke
loose."  They took off, stopping to pick up the others.

Someone driving by that night testified he saw someone in the van
before the shots were fired.

## ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)).  See also Lisenba v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962).  See also Henry, 197 F.3d at 1031; Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968).  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) as amended by the AEDPA, sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

2  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

3  II.  Claims of Evidentiary Error

4          In his second and third claims, petitioner alleges that the state trial court

5  committed evidentiary error.  He first claims that the trial court erred in excluding evidence

6  relevant to his defense theory that Ernesto Salcedo, Jr. was the actual shooter.  He also claims

7  that the trial erred in failing to limit or exclude the testimony of the prosecution's weapons

8  expert.  After setting forth the applicable legal principles, the court will evaluate these claims in

9  turn below.[3]

10         An evidentiary ruling, based on state law, may not be set aside in a federal habeas

11  corpus proceeding unless it "render[ed] the state proceedings so fundamentally unfair as to

12  violate due process."  Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).  See also Whelchel

13  v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th

14  Cir. 1993).  Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to

15  present a defense; this right is "a fundamental element of due process of law."  Washington v.

16  Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he

17  Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete

18  defense.'")  However, "that right is not unlimited."  Greene v. Lambert, 288 F.3d 1081, 1090 (9th

19  Cir. 2002).  The right to present a defense is restricted "to assure both fairness and reliability in

20  the ascertainment of guilt and innocence."  Chambers v. Mississippi, 410 U.S. 284, 298 (1973).

21  Thus, a state law justification for exclusion of evidence does not abridge a criminal defendant's

22  right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a

23  weighty interest of the accused."  United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also

24

25         [3] For purposes of clarity, the court will address these claims before addressing
    petitioner's first claim in which he alleges that he received ineffective assistance from his trial
26  counsel.

1   Crane, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to

2   exclude evidence at trial and the federal constitutional right to "present a complete defense");

3   Greene, 288 F.3d at 1090.

4          The United States Supreme Court has not articulated the specific set of

5   circumstances under which a criminal defendant must be permitted to introduce evidence of

6   third-party culpability.  The Court of Appeals for the Ninth Circuit has determined that where the

7   proffered evidence simply affords a possible ground of suspicion pointing to a third party and

8   does not directly connect that person with the actual commission of the offense, that evidence

9   may be excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993)

10  (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).  Under California law, a criminal

11  defendant has a right to present evidence of third party culpability if it is capable of raising a

12  reasonable doubt regarding his own guilt.  See Spivey, 194 F.3d at 978 (citing People v. Hall, 41

13  Cal. 3d 826, 833 (1986)).  In order for evidence pointing to another suspect to be admissible,

14  however, "there must be direct or circumstantial evidence linking the third person to the actual

15  perpetration of the crime."  Hall, 41 Cal. 3d at 833.  Motive or opportunity is not enough.  Id.

16          A.  Evidence of Third Party Culpability

17          Petitioner claims that the trial court erred in limiting his presentation of evidence

18  of third party culpability that was relevant to his defense theory that Ernesto Salcedo, Jr. was the

19  individual who shot the victim.  The decision of the California Court of Appeal is the last

20  reasoned state court decision on petitioner's claim in this regard.[4]  The state appellate court

21  rejected the claim, stating as follows:

22          One member of defendant's party handed Leyva a note which read,
            "Ernesto Salcedo $1000,000 209-476-6447 ! ! ! !" and asked for
23          Nicky Diaz.  Diaz testified he knew the senior Salcedo had died
            several years earlier and he had met the junior Salcedo.  Defendant
24          testified Ernie took them to the bar, saying he knew the owner, and

25

26          [4]  When reviewing the AEDPA standards, this court must review the "last reasoned"
    decision" by a state court.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

asked Leyva to call Diaz.  No other evidence explaining the note was admitted.

Defendant wanted to introduce evidence that would have cast suspicion on Ernesto Salcedo, Jr.  Most of this evidence came from statements by Diaz to the police.  Diaz had known Ernesto Salcedo, Sr., who had been in prison with Diaz's brother-in-law.  After his release, Salcedo, Sr., gave Diaz seed money to start his bar.  Salcedo, Sr., came by and Diaz gave him some payments, but did not entirely repay him.  Several years before this shooting, Salcedo, Sr., had been killed execution style; he was allegedly involved in a scheme to purchase $1,000,000 in counterfeit money.  The defense argued this evidence was direct evidence linking Salcedo, Jr., to the crime.  The prosecution moved to exclude the evidence.

After a lengthy discussion of the issue, the trial court ruled the defense could admit the fact of Salcedo, Sr.'s death, but not his murder or the alleged $1,000,000 counterfeit scheme.  The court noted the defense had not shown how it would prove the murder, other than perhaps by a stipulation, and there was no evidence for the $1,000,000 loss or that the Salcedo family believed Diaz was responsible.  The murder of Salcedo, Sr., had not been solved; the defense conceded it was speculation that the murder was over $1,000,000.

Defendant relies on People v. Jackson, (1991) 235 Cal.App.3d 1670.  In Jackson, the defendant wanted to introduce evidence that 30 minutes after the shooting, he was in a bar with several who had been present at the shooting.  He told Tolbert, "'Greg.  "You shot that guy."'"  Tolbert said he had not hit him.  When defendant persevered that Tolbert shot him, Tolbert replied, "'" Well, I don't care.  He was a bully."'" (Id. at p. 1677.)  The reviewing court found it error to exclude this probative statement against penal interest; it provided direct evidence that Tolbert had fired shots at the victim.  (Id. at pp. 1678-1679.)

This case is distinguishable.  In Jackson, supra, 235 Cal.App.3d 1670, the proffered evidence provided direct evidence that a third party was responsible for the crime.  To prove the statement was made, the defendant offered his own testimony and that of another witness to the statement.  Here, defendant could not indicate how he would prove his theory of Salcedo, Jr.'s involvement; he had no evidence, only speculation.  The only direct or circumstantial evidence of Salcedo, Jr.'s involvement in the shooting was defendant's testimony and Salcedo's name on the note.  This evidence was admitted.  Salcedo, Sr.'s murder, his involvement in a $1,000,000 counterfeiting scheme, and Diaz's connection to that scheme was pure speculation.  The flaw in defendant's offer of proof as to evidence of Salcedo, Jr.'s culpability was that he could not show how he would prove anything.

1
2
3
4
5
6
7

> In ruling to exclude evidence of Salcedo, Sr.'s murder and the
> counterfeiting scheme, the trial court recognized that it was based
> on speculation and lacked evidentiary support.  It indicated,
> however, that it was open to reconsideration if defendant could
> provide evidence.  "If evidence comes in that causes a
> reconsideration, then the Court would reconsider it, but I just don't
> see that we are going to accomplish anything useful, other than
> titillate the jurors' suspicions, prejudices, imaginations of some
> deep and million dollar conspiracy going on that definitely relates
> to the Salcedo family, because it seems to me, we don't have
> evidence of that."  Defendant never offered any additional evidence
> in a request for reconsideration.  The trial court did not err in
> excluding a speculative theory of third party culpability.

8  (Answer, Ex. 3 at 10-13.)

9        As explained above, habeas relief is available only if the trial court's decision to

10  exclude some of the more speculative evidence regarding possible ties between Nicky Diaz and

11  the Salcedos rendered the proceedings so fundamentally unfair as to violate federal due process

12  guarantees.  As described by the state appellate court, petitioner sought to raise doubt about the

13  identity of the shooter by introducing evidence that Ernesto Salcedo, Jr. (Salcedo, Jr.) may have

14  had a motive to shoot Leyva because Nicky Diaz had something to do with the murder of his

15  father, Ernesto Salcedo, Sr. (Salcedo, Sr.).  However, as discussed by the appellate court,

16  petitioner had no direct evidence to support this theory.  For instance, he could not prove the

17  actual circumstances of the death of Salcedo, Sr., such as the motive for the killing or the identity

18  of the perpetrators, nor was he able to show that the Salcedo family blamed Diaz for the killing

19  or had any other reason to retaliate against him.  Any possible connection between Nicky Diaz

20  and the alleged murder of Ernesto Salcedo, Sr. was based on pure speculation and was therefore

21  insufficient to directly connect Salcedo, Jr. to the shooting of Leyva.  The trial judge's decision

22  to exclude this speculative evidence was certainly not arbitrary or disproportionate.

23        In any event, the trial court did allow the introduction of evidence in petitioner's

24  possession of any link between Diaz and the Salcedo family.  Thus, Diaz was allowed to testify

25  that he knew Salcedo Sr. had died and that he had a meeting with Salcedo Jr. after the death of

26  his father.  (RT at 1330-31.)  Veevalu testified that petitioner told him the owner of the bar owed

1   his father money.  (Id. at 540-41.)  The note left at the bar was also admitted into evidence.  All

2   of this evidence was used by defense counsel to support his argument that Ernesto Salcedo Jr.

3   had a motive to commit the shooting and that the eyewitnesses, whose descriptions of the shooter

4   were widely divergent, were simply mistaken in their identification of petitioner as the shooter.

5   (Id. at 1650, 1661-62, 1681-82.)  The evidence in question was also used by defense counsel to

6   support his argument that the prosecutor's theory that the shooting was unprovoked and

7   "pointless" did not make sense in light of a possible motive on the part of Salcedo, Jr. to obtain

8   revenge against Nicky Diaz because of a debt owed to his father.  (Id. at 1599, 1610.)  Under

9   these circumstances, the trial court's decision to exclude additional but speculative evidence

10  about a possible link between Nicky Diaz and the murder of Ernesto Salcedo, Sr. did not prevent

11  petitioner from presenting his defense of actual innocence, nor did it render his trial

12  fundamentally unfair.  Speculative rumors of the reason for Salcedo, Sr.'s murder and the

13  seemingly unconnected fact that Salcedo, Sr. had loaned Nicky Diaz seed money to open his bar

14  would not have been sufficient to change the outcome of petitioner's trial.  The decision of the

15  California Court of Appeal rejecting petitioner's claim in this regard is neither contrary to nor an

16  unreasonable application of federal law and should not be set aside.

17          B.  Failure to Limit the Testimony of an Expert Witness

18                  Petitioner also claims that the trial court erred when it failed to "sufficiently limit"

19  the testimony of the prosecution's weapons expert.  (Pet. at 6.)  He argues that "permitting the

20  prosecution's criminalist to testify concerning his opinions on the similarities between the

21  expended casings found at the scene of the shooting and the unexpended cartridges found at

22  petitioner's home, the trial court committed error."  (Id. at 80.)  Petitioner contends that the

23  testimony of the prosecution's expert, which suggested that there might be a similarity between

24  the casings found at the scene and the cartridges found at petitioner's residence, allowed the jury

25  to overlook the conflicting eyewitness testimony as to the description of the shooter.  (Id. at 82.)

26  /////

1    Petitioner also argues that the prosecutor violated state discovery laws by his untimely disclosure

2    to the defense of the weapons expert's opinion.  (Id. at 80-81.)

3              This claim was rejected by the California Court of Appeal in its decision on

4    petitioner's direct appeal and by the California Supreme Court, without comment, in response to

5    the petition for review.  (See Answer, Exs. 3, 4.)  The California Court of Appeal described the

6    background to this claim and the reasoning behind its decision as follows:

> During in limine motions before trial, the prosecutor disclosed that
> he had just recently provided to the defense a criminalist's report,
> prepared months earlier, comparing the 15 casings found at the bar
> to ammunition seized at defendant's residence.  The report
> indicated the 15 shots at the bar were fired by the same gun.  The
> ammunition from defendant's residence was of the same type, but
> it could not be determined to have been cycled through the same
> weapon at the bar.  The prosecutor wanted to introduce evidence of
> the ammunition found at defendant's residence and the defense
> objected on the basis of late discovery.  The prosecutor argued the
> late disclosure was not prejudicial because there was no evidence
> connecting the ammunition to the gun used in the crime; the
> comparison was inconclusive.  The court ruled the ammunition
> found at defendant's residence was admissible.
>
> During trial a police officer testified he seized some Spear .9
> millimeter ammunition from defendant's residence.
>
> Before he testified, it became apparent that the criminalist, Gerald
> Arase, had more definite opinions about the similarity of the
> ammunition found at defendant's residence and that from the bar
> than was in his report.  It was his opinion that it was "highly likely"
> that the feeder marks on a bullet found at defendant's residence
> had been cycled through the same gun as used at the bar.
> Defendant objected to the admission of any evidence of the
> ammunition found at defendant's residence.
>
> After considerable discussion, the court permitted Arase to testify
> about the ammunition found at defendant's residence, but he was
> not allowed to indicate he believed it had been cycled through the
> weapon used at the bar.  Arase testified he examined the seven
> rounds found at defendant's residence.  They were Spear
> ammunition, with the same manufacturer's stampings as those on
> 13 of the casings found at the bar.  One of the rounds seized from
> defendant's residence had feeder marks, but they were insufficient
> to determine if it had been cycled through the same gun as that
> used at the bar.  Arase could not say the feeder marks came from a
> different weapon.  The trial court later referred to this evidence as
> "not of itself very powerful."

1

2

3

4

5

6

7

8

9

10

11

12

Defendant contends the trial court erred in failing to limit or exclude Arase's testimony. The prosecution failed in its duty to provide timely discovery by failing to turn over Arase's report for many months. (Pen. Code, § 1054.1, subd. (f); § 1054.7.) "It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm. [Citation.]" (People v. Pinholster (1992) 1 Cal.4th 865, 941.) Defendant did not request a continuance.

Nor can he show prejudice. Defendant contends he was prejudiced by Arase's testimony as to the similarity of the feeder marks on ammunition from his home to that found at the shooting scene. Arase did not testify, however, that the feeder marks were similar. The trial court excluded that testimony. Instead, he only testified one of the bullets found had feeder marks and no comparison could be made. Like the trial court, we do not view Arase's testimony as damaging as does defendant. Arase simply indicated that the same type of ammunition was found at defendant's as some of that used in the shooting; he did not tie that ammunition to the gun used in the shooting. On cross-examination, Arase testified Spear was a common brand of .9 millimeter ammunition. There was no prejudicial error in admitting Arase's testimony.

13    (Opinion at 13-15.)

14    The decision of the California Court of Appeal rejecting petitioner's evidentiary

15    ruling claim is not contrary to or an unreasonable application of the federal due process standards

16    set forth above. The testimony of prosecution criminalist was curtailed by the trial court to

17    eliminate any affirmative connection between the ammunition found at petitioner's residence and

18    the specific gun used in the bar shooting. The criminalist's trial testimony was inconclusive on

19    the issue of whether any of the ammunition found petitioner's residence had been cycled through

20    the same gun that was used in the shooting. The admission of such testimony did not render

21    petitioner's trial fundamentally unfair. Accordingly, petitioner is not entitled to relief on this

22    claim.

23    III. Ineffective Assistance of Counsel

24    Petitioner claims that he received constitutionally ineffective assistance of counsel

25    through numerous errors of counsel. After setting forth the applicable legal principles, the court

26    will evaluate each of these claims below.

1    A.  Legal Standards

2         The Sixth Amendment guarantees the effective assistance of counsel.  The United

3    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

4    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

5    counsel, a petitioner must first show that, considering all the circumstances, counsel's

6    performance fell below an objective standard of reasonableness.  Id. at  687-88.  After a

7    petitioner identifies the acts or omissions that are alleged not to have been the result of

8    reasonable professional judgment, the court must determine whether, in light of all the

9    circumstances, the identified acts or omissions were outside the wide range of professionally,

10   competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an

11   ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's

12   performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison,

13   477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong

14   presumption that counsel "exercised acceptable professional judgment in all significant decisions

15   made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

16        Second, a petitioner must establish that he was prejudiced by counsel's deficient

17   performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

18   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

19   been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

20   confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

21   F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

22   performance was deficient before examining the prejudice suffered by the defendant as a result of

23   the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

24   lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

25   955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

26   /////

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).   In this regard, it has been recognized that "the adversarial process will not function normally unless the defense team has done a proper investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998)(citing Kimmelman, 477 U.S. at 384).  Therefore, counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted).  On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S. at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate"); Babbitt, 151 F.3d at 1173-74.  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" Bragg, 242 F.3d at 1088 (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d 1054, 1070 (9th Cir. 2002).

/////

B. <u>Petitioner's Claims</u>

1. <u>Third Party Culpability</u>

Petitioner first claims that his trial counsel rendered ineffective assistance because of his failure to investigate and present evidence of the culpability of a third party, Ernesto Salcedo, Jr., for the shooting of the bartender. Specifically, he contends that counsel's failure to investigate the "double homicide" of Salcedo, Sr., described in connection with the claim above, resulted in the withdrawal of a "meritorious" defense that Salcedo, Jr., and not petitioner, shot Leyva. Petitioner contends the evidence would have established that Salcedo, Jr., who was also present at the scene of the crime, had a motive and the opportunity to commit the crime. Petitioner also contends that further investigation into Salcedo, Sr.'s murder would have "raise[d] the possibility" that Veevalu's testimony identifying petitioner as the shooter was "mistaken." (Pet. at 5, Traverse at 16.) Petitioner argues that counsel's failure to conduct such investigation foreclosed the opportunity to present a meritorious defense of third party culpability. (Pet. at 5.)

This claim was rejected by the California Superior Court in its decision denying petitioner's petition for writ of habeas corpus. (Answer, Ex. 5.) This decision is the basis for the state court judgment on petitioner's ineffective assistance of counsel claim. <u>Avila</u>, 297 F.3d at 918. The Superior Court explained as follows:

> Petitioner states that [attorney] Cingcon did not adequately investigate the double homicide of Ernesto Salcedo Sr., and his companion, an event that was essential to a proper understanding of the case. The prosecution pursued the case against petitioner on the theory that he shot bartender Leyva while trying to collect a debt from bar owner Nicky Diaz associated with the death of Ernesto Salcedo, Jr. [sic] (See pp. 10-11 of the Third District Court of Appeal decision.) Cingcon also failed to speak with Carmen Salcedo. She may have been able to impeach information about her husband's death provided by Diaz. His failure to speak with her resulted in the trial court's denial of the introduction of evidence for the purpose of establishing the third party culpability of Ernesto Salcedo, Jr. (Pp. 2-3 of the attached pleading paper petition.)

16

1
2
3
4
5
6
7

> Third party culpability need only be capable of raising a reasonable doubt as to the defendant's guilt.  (People v. Cudjo (1993) 6 Cal.4th 585, 609; People v. Hill (1986) 41 Cal.3d 826, 833.)  Evidence of mere motive or opportunity to commit the crime without more will not suffice to raise a reasonable doubt.  There must be direct or circumstantial evidence linking a third party to the commission of the crime.  (People v. Hill, supra.)  In this instance, petitioner has not established that Carmen Salcedo would, in fact, impeach the testimony of Nicky Diaz.  Even if she would have done so, he has not explained how such evidence would tend to raise a reasonable doubt as to his guilt by linking Ernesto Salcedo, Jr. to the crime.

8    (Answer, Ex. 5 at 4.)

9         The state court record reflects that the trial court held a lengthy hearing on the

10   prosecution's motion to exclude additional evidence relating to the murder of Ernesto Salcedo,

11   Sr. which petitioner sought to introduce in support of his third party culpability defense.  (CT at

12   100; RT at 2-110.)  At that hearing, petitioner's trial counsel argued that evidence of Salcedo,

13   Sr.'s murder was relevant to petitioner's defense that he did not commit the shooting.

14   Petitioner's counsel argued, in effect, that Salcedo, Jr. may have felt animosity toward Nicky

15   Diaz, the owner of the bar, because Diaz owed Salcedo, Sr. money and/or may have been

16   connected to Salcedo, Sr.'s murder.  In other words, counsel argued that Salcedo, Jr. may have

17   killed Leyva out of revenge.  As described above, in connection with petitioner's claim that the

18   trial court erred in its evidentiary ruling, the trial court excluded some, but not all, of this

19   evidence on the grounds that it was unduly speculative.

20         The gist of this aspect of petitioner's ineffective assistance of counsel claim is that

21   had his trial counsel conducted a more thorough investigation of these events, he may have

22   discovered additional evidence in support of the defense theory of third party culpability.

23   However, petitioner does not describe any additional evidence that would have surfaced if

24   counsel had conducted further investigation into the death of Salcedo, Sr.   Indeed, it is not clear

25   that there was any additional evidence to be found.  The murder of Salcedo, Sr. was still

26   unsolved at the time of petitioner's trial.  Accordingly, there was no concrete evidence linking

17

1  Nicky Diaz or anyone else to Salcedo, Sr.'s death.  In the petition before this court, as in the trial

2  court, petitioner provides no specific evidence linking Salcedo, Sr.'s murder five or six years

3  earlier to the identity of the shooter at the bar and does not explain why Salcedo Sr.'s son would

4  have attempted to murder Leyva (or Nicky Diaz) so many years after his father's death.

5  Petitioner appears to be simply guessing that an investigation might have turned up exculpatory

6  evidence.  However, as noted above, speculation is insufficient to establish an ineffective

7  assistance claim.  Petitioner has failed to identify any improper acts or omissions of counsel

8  demonstrating that counsel's investigation of this issue was insufficient or otherwise outside the

9  wide range of professional, competent assistance.  In the absence of such specificity, there is a

10  strong presumption that counsel's performance was adequate.  <u>Kimmelman</u>, 477 U.S. at 381.

11                    2.  <u>Failure to Further Investigate Bar Patrons</u>

12           Petitioner next claims that his trial counsel rendered ineffective assistance because

13  of his failure to investigate and show a photo lineup to the other bar patrons on the night of the

14  shooting.  Some of these persons gave descriptions of the shooter which differed from the

15  description offered by prosecution witness Veevalu.  Others were unable to identify petitioner

16  from a police photo lineup.  Petitioner argues this information should have been presented to the

17  jury because it would have cast doubt on Veevalu's testimony that petitioner was the shooter.

18  He also notes that his counsel informed the jury during opening argument that he would present

19  eyewitnesses who failed to select petitioner as the shooter during the photo lineup and then failed

20  to do so.

21           Bar patron Kenneth Rowe identified the shooter as "Asian" whereas petitioner is

22  Mexican and Caucasian.  Two bar patrons, Juanita Parraz and Connie Parraz, informed police

23  that they could identify the shooter, but failed to pick petitioner out of a photo lineup.  In fact,

24  petitioner suggests that Juanita Parraz at different times identified both Salcedo, Jr. and another

25  /////

26  /////

18

1   person as the shooter.[5]  According to petitioner, if his trial counsel had interviewed these

2   potential witnesses, he may have obtained evidence to bolster the defense theory that it was

3   Ernesto Salcedo, Jr. who committed the crime.  Petitioner argues that Juanita Parraz's selection

4   of Salcedo Jr. from the photo lineup was crucial evidence supporting his defense of third party

5   culpability and that counsel's failure to present such evidence to the jury allowed the prosecutor

6   to "cover up" the fact that petitioner was not the shooter.  (Pet. at 18.)

7                   The California Superior Court rejected these claims, explaining its reasoning as

8   follows:

9               Petitioner further argues that Cingcon did not bring forward
            numerous witnesses who could have impeached the [sic] Fred
10           Veevalu's photo lineup identification of him as the shooter.  Such
            witnesses included Kenneth Rowe, Michael Chavez (apparently
11           "Martin Jose Chavez Garcia"), Raphael Barrajas, Connie Perez and
            Juanita Perez (apparently "Parraz").  They would have
12           corroborated his defense.  (Pp. 4, 27-28 of the attached pleading
            paper petition.)
13
            An examination of the exhibits provided by petitioner fail to
14           substantiate his claim.  In a police report, Rowe described the
            shooting, and said that, "The man with the gun was Asian.  I could
15           not tell how old he was or what type of clothing that he was
            wearing . . . I cannot describe him very well."  (P. 38 of the
16           exhibits.)  He has also provided witness statements from Juanita
            Parraz, Martin Jose Chavez Garcia, and Raphael Barrajas.  Juanita
17           Parraz and Connie Parraz told the police that they could identify
            the shooter.  (Pp. 29, 42 of the exhibits.)
18
            But petitioner has only alleged that Connie Parraz was unable to
19           pick anyone out of the lineup, while Juanita Parraz made two
            identifications.  Neither of them was petitioner, while one of them
20           was Ernesto Salcedo, Jr. (Pp. 5, 10, 16 of the attached pleading
            paper petition.)  Barrajas described the suspect as having the
21           outline of a gun in his waistband, but neither Barrajas, nor his

22   _____

23   [5]  It appears from attachments to petitioner's state court habeas petitions that Juanita
     Parraz reported to police that she had been in the bar with her sister on the day in question for
24   about one and half hours and had consumed approximately 4 or 5 12 ounce beers during that
     period when she heard 4 or 5 shots ring out and saw a man behind her pointing a handgun at
25   people playing pool.  She told police that the shooter then walked to the bar, fired several shots at
     the bartender on the ground and then walked out of the bar with a friend.  She described the
26   shooter at that time as a 5'8", 220 lb. male Samoan with black hair combed back in a 3 inch
     ponytail and wearing dark clothing.

1    companion, apparently Martin Chavez Garcia, were able to identify
     the shooter.  (Pp. 17, 26 of the attached pleading paper petition.)
2

3    Petitioner contends that such evidence would have enabled him to
     present evidence that Ernesto Salcedo, Jr. shot Leyva.  Cingcon's
4    ineffectiveness was magnified by the fact that Cingcon informed
     the jury during opening argument that he would bring forward
5    witnesses who identified someone other than petitioner as the
     shooter.  (Pp. 10-16 of the attached pleading paper petition.)
6    Admittedly, Juanita Parraz selected Salcedo, Jr. in the photo
     lineup, but she also picked out someone else as well.  None of the
7    other witnesses identified Salcedo, Jr., or anyone other than
     petitioner, as the shooter.  Accordingly, such evidence would not
8    have established a link between Salcedo, Jr., and the shooting of
     Leyva as required.  Cingcon did not render ineffective assistance of
     counsel as alleged.  (<u>Strickland v. United States</u>, <u>supra</u>.)
9

10   (Answer, Ex. 5 at 5.)

11          Even assuming arguendo that counsel's failure to investigate all of the persons at

12   the bar on the night of the shooting was outside "the wide range of professionally competent

13   assistance" that the Sixth Amendment requires, petitioner has failed to demonstrate how a more

14   thorough investigation of these potential witnesses would have led to a different outcome.

15   Petitioner's contention that further investigation by counsel may have uncovered exculpatory

16   evidence is insufficient to establish prejudice.  <u>See</u> <u>United States v. Berry</u>, 814 F.2d 1406, 1409

17   (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he

18   offered no indication of what potential witnesses would have testified to or how their testimony

19   might have changed the outcome of the hearing); <u>United States v. Harden</u>, 846 F.2d 1229, 1231-

20   32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where,

21   among other things, there was no evidence in the record that the witness would testify);

22   <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim

23   denied where he presented no evidence concerning what counsel would have found had he

24   investigated further, or what lengthier preparation would have accomplished).  As noted by the

25   California Superior Court, none of the witnesses, including Juanita Parraz, could have

26   definitively or persuasively testified that it was Ernesto Salcedo, Jr. who shot the bartender, Mr.

1    Leyva.[6]  Finally, there was, in fact, evidence presented at trial that petitioner may not have been

2    the shooter and that Salcedo, Jr. might have had a motive to commit the crime.  The jurors chose

3    to reject this defense theory and to believe, instead, the testimony of the prosecution witnesses

4    who positively identified petitioner as the person who fired the shots.

5         As noted above, "'ineffective assistance claims based on a duty to investigate

6    must be considered in light of the strength of the government's case.'"  Bragg, 242 F.3d at 1088

7    (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  Here, the prosecution's

8    case against petitioner was strong.  Several eyewitnesses testified that petitioner was the shooter

9    and incriminating evidence was found at petitioner's apartment and at the scene of the shooting.

10   Prosecution witness Veevalu testified that he had two separate and lengthy conversations with

11   petitioner on the night of the shooting during which petitioner identified himself as "Lou."  (RT

12   at 536-47.)  Veevalu further testified that he watched petitioner shoot Leyva.  (Id.)  He stated that

13   petitioner pointed the gun at him after he fired several shots at Leyva, then turned back to the bar

14   and fired more shots behind the bar, and then turned again and pointed the gun while making eye

15   contact.  (Id. at 554-58, 560.)  Veevalu was about sixteen feet from petitioner while this was

16   happening.  (Id. at 556-57.)  Veevalu was "keep[ing] a visual" on petitioner the whole time the

17   shooting was taking place.  (Id. at 559.)  Veevalu also identified petitioner from a photo lineup as

18   the person who shot Leyva.  (Id. at 537-38.)  From this court's review of the record, it appears

19   that Veevalu testified clearly and without hesitation to the events at the bar and did not appear to

20   have any difficulties with his memory of the events nor did he express any doubt as to what

21   occurred.  He testified there was "no doubt in [his] mind" that petitioner was the shooter.  (Id. at

22   /////

23

24        [6]  As noted above, police reports submitted by petitioner in state court in support of this
     claim indicate that Ms. Perez had been drinking, identified more than one individual as the
25   shooter in photo lineups and described the shooter as a male Samoan - a description that fit
     neither petitioner nor Salcedo, Jr.  Moreover, her description of the shooter as approximately 5'8"
26   with a 3 inch ponytail otherwise closely matched the description given by prosecution witness
     Mr. Veevalu.

633.)  Craig Chavez, another eyewitness, also identified petitioner as the shooter at trial and had

previously identified petitioner as the shooter from a photo lineup.  (RT at 665, 670.)

          The potential importance of Juanita Parraz's identification of Salcedo, Jr. from a

photo lineup is diminished by the fact that she also selected another person as the possible

shooter.  In addition, she had been drinking, described the shooter to police as a Samoan male

and otherwise provided a description that arguably matched those provided by witnesses who

identified petitioner as the shooter.  Similarly, although Kenneth Rowe described the shooter as

"Asian," this was again a description that matched neither petitioner nor Salcedo, Jr., who

petitioner identified as the shooter.  The fact that witnesses Martin Chavez, Raphael Barrajas and

Connie Perez were unable to identify anyone as the shooter from photo lineups containing

petitioner's photograph is also not significant.  These bar patrons did not have the extensive

contact with petitioner as witness Veevalu, who observed petitioner at close range and for an

extended period of time.  Moreover, there is no evidence suggesting that these potential

witnesses watched the shooting with the same focus and interest as Veevalu did.  Thus, there has

been no showing by petitioner that testimony from these other bar patrons would have impeached

Veevalu's credibility.

          Other alleged omissions by petitioner's trial counsel do not stand up to close

scrutiny.  For instance, Raphael Barrajas provided trial testimony favorable to petitioner.  He

testified on direct examination that he did not see who shot the victim.  (RT at 733-34.)  He also

testified that the person who wore the Chicago Bulls shirt, appeared to have a gun and poured his

beer on the floor was not in the courtroom.  (Id. at 733-34.)  Additional favorable testimony to

the effect that Barrajas was unable to identify petitioner from a photo lineup would have been

cumulative and unnecessary.  Although Ed Ane testified at trial that he did not actually see the

shooter, he had previously picked petitioner out of a photo lineup and told the police officer

conducting the lineup that petitioner was the "guy that pulled the gun."  (Id. at 786.)  Further

/////

1  investigation of this witness by petitioner's counsel would, in all likelihood, simply have

2  uncovered this additional evidence incriminating petitioner.

3         3.  In limine Ruling

4         In a related argument, petitioner argues that towards the end of trial when his trial

5  counsel became aware that Juanita Parraz' had identified Salcedo, Jr. in a photo lineup, counsel

6  should have requested reconsideration of the trial court's in limine ruling prohibiting the

7  introduction of evidence of third party culpability.  Petitioner notes that during the hearing on the

8  in limine motion, the trial judge indicated that he might reconsider his ruling if there was

9  evidence that any witness had identified Salcedo, Jr. from a photo lineup as the shooter.

10  Petitioner argues that this is just such evidence.  The California Superior Court rejected this

11  claim as follows:

12         During closing argument, petitioner states that Cingcon failed to
        request that the court reconsider its ruling prohibiting him from
13         introducing evidence of his third party culpability defense.  If
        Cingcon had done so, he could have persuaded the court to permit
14         him to introduce evidence of Juanita Parraz's identification of
        Ernesto Salcedo, Jr.  He believes that the prosecution may have
15         provided Cingcon with a police report of her identification of
        Salcedo, Jr. near the end of trial.  (Pp. 18-20 of the attached
16         pleading paper petition.)  This claim is rejected for the same reason
        as earlier ones associated with his stymied third party culpability
17         defense.  Parraz identified Salcedo, Jr. and another person as the
        shooter.  Her confused inability to clearly identify the shooter
18         would not have persuaded the trial court to reconsider its earlier
        adverse decision.

19

20  (Answer, Ex. 5 at 7.)

21         This court concludes that petitioner has failed to demonstrate prejudice with

22  respect to this claim.  As described above, the trial court excluded certain speculative evidence of

23  a link between Salcedo, Jr. and Nicky Diaz, but allowed other, more concrete evidence to the

24  same effect.  Evidence that one of the bar patrons identified Salcedo, Jr. and one other person

25  from a photo lineup as the possible shooter, while significant, was similarly inconclusive and

26  would probably not have led to a different ruling on the in limine motion.  This is particularly

23

1  true in light of the nature and character of the witnesses' statements to police. See supra p. 21, n.

2  6. The state court's conclusion that admission of this evidence at trial would not have led to a

3  different verdict is not "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

4  Accordingly, petitioner is not entitled to relief on this claim.

5  4. Evidence Found at Petitioner's Apartment

6  Petitioner next claims that his trial counsel rendered ineffective assistance because

7  of his failure to introduce exculpatory evidence found at petitioner's apartment by police eleven

8  days after the shooting. The California Superior Court rejected this claim, stating as follows:

9  > Petitioner maintains that Cingcon did not address key issues that
> pointed to petitioner's innocence. On April 11, 1996, federal
10 > agents and Sacramento police officers raided his home. They
> confiscated a red sweater with a letter "S" for Stanford. They did
11 > not find a Chicago Bulls shirt. Nor did they find a red bandanna or
> a pager. Furthermore, the officers called the number on the note
12 > given to Leyva, and the pager did not ring. Cingcon never brought
> any of this evidence to the attention of the jury. (Pp. 3, 23 of the
13 > attached pleading paper petition.) Cingcon's failure to emphasize
> such evidence does not constitute ineffective assistance of counsel.
14 > (Strickland v. United States, supra.) Law enforcement raided his
> home 11 days after the commission of the offense. Accordingly, it
15 > was possible that he wore a different shirt, and utilized a different
> pager at the time of the offense.

16

17 (Answer, Ex. 5 at 4-5.)

18  This court agrees that the passage of time between the shooting and the search of

19 petitioner's home neutralized the impact of the police officers' failure to find a Chicago Bulls

20 shirt or the pager referenced in the note given to the victim. Trial counsel's decision not to

21 introduce this evidence was not outside the wide range of reasonable professional assistance.

22  5. Bail Review Hearing

23  Petitioner next claims that his trial counsel provided ineffective assistance when

24 he failed to challenge the prosecutor's statements at a bail review hearing that the victim was

25 shot seven to twelve times, when police reports suggested that he was shot only twice. Petitioner

26 argues that the prosecutor's unchallenged misstatements caused the trial judge to become biased

24

against him and resulted in a failure to obtain release on bail, so that he was forced to face trial as

an inmate and not as an "innocent man." (Pet. at 12.)  Petitioner also argues that evidence

regarding the number of shots actually fired was relevant to show "one's deliberate intent to

murder or assault and/or deliberate attempt to miss the victim and get out of a hostile bar."  (Id. at

13.)

> The California Superior Court rejected this claim with the following reasoning:
>
>> Finally, petitioner has alleged other instances of ineffective
>> assistance by Cingcon prior to trial unrelated to the substance of
>> his defense.  He states that, during a bail hearing, Cingcon
>> permitted the prosecution to argue against his bail by claiming that
>> he had shot Leyva 7 to 12 times.  In fact, police reports indicated
>> that Leyva had only been shot two or three times at most.  Cingcon
>> permitted the prosecution to prejudice him during this hearing, and,
>> if Cingcon had objected, a more favorable result was probable.  (P.
>> 6 of the attached pleading paper petition.)  Such a claim is dubious,
>> as it is doubtful that the court would have been more inclined to
>> release him on bail on the basis that he only shot Leyva twice
>> instead of 7 to 12 times.  Furthermore, the issue is now moot as he
>> is currently incarcerated in the Department of Corrections as a
>> result of his criminal conviction. (citation omitted).

(Answer, Ex. 5 at 8.)

> The Superior Court's determination in this regard was not contrary to or an

unreasonable application of federal law and should not be set aside.  As explained by the

Superior Court, petitioner's challenge to the trial court's failure to release him on bail pending

trial is now moot.  In addition, petitioner's vague and unsupported claim that his status as a pre-

trial detainee instead of a criminal defendant released on bail caused the jury and/or the trial

judge to be biased against him does not warrant the granting of habeas relief.  See Jones v.

Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994))

("'[c]onclusory allegations which are not supported by a statement of specific facts do not

warrant habeas relief'").  Accordingly, petitioner is not entitled to relief on this claim.

/////

/////

6. Testimony from Family Members

Petitioner next claims that his trial counsel rendered ineffective assistance by failing to produce members of petitioner's family as character witnesses at trial to testify as to petitioner's "good character, high morals, family ties and strong religious beliefs." (Pet. at 22.) Petitioner argues that his character and credibility were key issues because of his defense of actual innocence.  The California Superior Court rejected this claim based upon the following reasoning:

> Petitioner also contends that Cingcon also failed to produce character witnesses who would have testified to his good character and strong family ties.  Such witnesses would have bolstered his credibility when he testified in his own defense. (P. 21 of the attached pleading paper petition.)  Given that none of these witnesses would have been able to corroborate his version of the incident, a more favorable result was not probable.  Cingcon's failure to produce character witnesses also falls within the bounds of an acceptable tactical decision by trial counsel. (Strickland v. Washington, supra; People v. Ledesma, supra.)

(Answer, Ex. 5 at 6.)

The decision of the Superior Court in this regard is neither contrary to nor an unreasonable application of federal law.  Evidence that petitioner was regarded as a good person by his family would not have changed the outcome of this trial in light of the significant eyewitness testimony describing petitioner's shooting of the bartender.  Petitioner has failed to show prejudice with respect to this claim and relief should be denied.

7. Evidence of Ammunition and Guns

Petitioner also claims that his trial counsel rendered ineffective assistance when he failed to introduce evidence that the nine-millimeter ammunition found at petitioner's residence came from a handgun owned by his mother.  He states that his mother, who is in the military, took her handguns with her when she moved out of the residence in question but left some of the bullets behind.  Petitioner also contends that ballistic tests would have demonstrated that the bullets found at the scene of the crime did not come from his mother's guns.

26

1   The California Superior Court rejected this claim, stating as follows:

2   Petitioner asserts that Cingcon did not investigate and rebut the
    prejudicial evidence of the .9 millimeter rounds of ammunition
3   found at his home.  He told Cingcon that his mother owned two
    registered .9 millimeter Glock handguns.  She had lived there, and
4   left the weapons behind when she moved to Galt.  (P. 22 of the
    attached pleading paper petition.)  Even if Cingcon had introduced
5   this evidence, it would not have tended to establish his innocence
    as he had access to the weapons and the ammunition by virtue of
6   living at the residence.  Furthermore, the jury may not have
    believed his mother's testimony about it because of the parental
7   relationship.

8   (Answer, Ex. 5 at 6.)

9   Petitioner argues that the Superior Court's rejection of this claim was based on the

10  incorrect factual assumption that petitioner's mother left her handguns behind, as well as her

11  bullets, when she moved to Galt.  Even assuming arguendo that the Superior Court decision rests,

12  in part, on an incorrect factual assumption, that court's ultimate conclusion that petitioner failed

13  to show prejudice with respect to this claim was not erroneous.  The evidence regarding the .9

14  millimeter bullets found at petitioner's residence was relevant to show that petitioner had access

15  to the type of bullets used in the shooting, not that any particular gun was the assault weapon.

16  Evidence that petitioner's mother owned a gun or that she may have originally been the owner of

17  the bullets found in petitioner's residence was largely irrelevant.  In any event, petitioner fails to

18  establish demonstrate what ballistic tests on the guns and/or ammunition owned by his mother

19  would have revealed.  For these reasons, petitioner is not entitled to relief on this claim.

20  8.  Possible Exculpatory Evidence

21  Petitioner next argues that his trial counsel rendered ineffective assistance in

22  failing to: (1) obtain an expert in handwriting analysis to corroborate petitioner's testimony that

23  he did not write the note left at the scene of the crime; (2) ascertain the owner of the pager

24  number listed in the note or provide evidence that the telephone number did not match

25  petitioner's pager; (3) investigate the telephone records of the bar to challenge the victim's

26  testimony that he did not make any telephone calls from the bar; (4) request a continuance of the

27

1   trial in order to locate two persons who drove by the bar at the time of the shooting because these

2   persons may have been able to identify the shooter and/or could have corroborated petitioner's

3   trial testimony that two "aggressors" arrived at the bar in response to a telephone call from

4   Leyva; (5) investigate percipient witnesses Teresa Ybarro and Anita Ybarro, who may have been

5   able to testify to the tense atmosphere in the bar and the events leading up to the shooting; (6)

6   seek out and investigate a percipient witness named "Mejia," who was sitting near petitioner at

7   the bar and might have seen something to aid petitioner's defense; (7) locate and investigate a

8   "potential defense witness" named Martin Jose Chavez Garcia, who provided a description of the

9   shooter as approximately 5'6" tall; and (8) locate and interview possible defense witness Sergio

10  Brieto who was at the bar at the time of the shooting and may have been able to provide

11  exculpatory evidence.

12          The Superior Court rejected all of the claims described above based upon the

13  following analysis:

14              All of these claims must be rejected as petitioner has not alleged
                that Cingcon's alleged failure to investigate actually resulted in the
15              loss of exculpatory evidence.  In regard to the fourth one,
                petitioner's height is listed as 5'8", so Martin Jose Chavez Garcia's
16              description of his height was close to his actual measured height.
                Accordingly, he has not alleged that he was prejudiced as a result
17              of Cingcon's alleged ineffectiveness.  (Strickland v. United States,
                supra.)
18

19  (Answer, Ex. 5 at 7.)  This court also concludes that petitioner has failed to establish prejudice

20  with respect to these claims.  Petitioner's speculation that further investigation into these various

21  areas of inquiry may have provided exculpatory evidence is insufficient to establish a Sixth

22  Amendment violation.  Villafuerte, 111 F.3d at 632 ("[Petitioner] presented no evidence

23  concerning what [his attorney] would have found had he investigated further, nor what lengthier

24  preparation would have accomplished."); Harden, 846 F.2d at 1231-32; Berry, 814 F.2d at 1409.

25  /////

26  /////

1          9. <u>Voluntary Intoxication</u>

2          Petitioner also claims that his trial counsel rendered ineffective assistance when

3   he failed to obtain expert testimony on the effects of voluntary intoxication on petitioner's mental

4   state.  Petitioner contends that he drank "substantial amounts of alcohol" prior to the shooting,

5   which rendered him incapable of forming "reasonable premeditation."  (Pet. at 31.)  The

6   California Superior Court rejected this claim as follows:

7              Petitioner states that Cingcon should have produced evidence of
              voluntary intoxication to establish that he did not form the requisite
8              mental state for attempted murder.  (Pp. 24-25 of the attached
              pleading paper petition.)  A defendant may introduce evidence of
9              intoxication to establish his lack of the required mental state for
              this offense.  (Pen. Code, § 22(b).)  But, in this instance, it is
10             impossible to imagine how a jury could have concluded that he did
              not shoot Leyva with the deliberate, premeditated intention of
11             killing him.  He entered the bar, inquired about the owner, gave
              Leyva a note demanding money, dumped his beer and then started
12             shooting Leyva.

13  (Answer, Ex. 5 at 7.)

14         Petitioner points out that the evidence introduced at trial did not show petitioner

15  gave Leyva a note or demanded money but rather that another member of petitioner's group

16  handed Leyva a note referencing a dollar amount.  Notwithstanding the Superior Court's mistake

17  of fact in this regard, petitioner has failed to establish that his trial counsel's failure to introduce

18  evidence of voluntary intoxication fell below an objective standard of reasonableness.

19  Petitioner's defense at trial was that he was not the shooter.  A defense of diminished capacity

20  would have been inconsistent with that defense in that it would have required petitioner to admit

21  that he was the shooter, but lacked the ability to form premeditation.  Trial counsel's reasonable,

22  strategic tactical decision to forego investigation into a viable defense in favor of a conflicting

23  defense does not constitute ineffective assistance.  <u>Bean v. Calderon</u>, 163 F.3d 1073, 1082 (9th

24  Cir. 1998).  Once petitioner's trial counsel reasonably chose to present a defense of actual

25  innocence, his duty to investigate the directly conflicting defense of diminished capacity was "at

26  an end."  <u>Id</u>.  <u>See also</u> <u>Strickland</u>, 466 U.S. at 691 ("the reasonableness of counsel's actions may

                                                29

1   be determined or substantially influenced by the defendant's own statements or actions"); Turk v.

2   White, 116 F.3d 1264, 1267 (9th Cir. 1997) ("when the facts that support a certain potential line

3   of defense are generally known to counsel because of what the defendant has said, the need for

4   further investigation may be considerably diminished or eliminated altogether").

5                              10.   Restitution Fine

6              Petitioner next claims that his trial counsel rendered ineffective assistance by

7   failing to object to the $330,486.74 restitution fine that petitioner was assessed as part of his

8   sentence.  Petitioner argues that he will not be able to pay this fine.  In light of the severe injuries

9   suffered by the victim of the offense, petitioner has failed to show that an objection to the amount

10  of the restitution fine would have resulted in a different sentence, notwithstanding his inability to

11  pay.[7]  Accordingly, petitioner is not entitled to relief on this claim.

12                             11.   Challenge to the Jury Verdict

13             In his next claim, petitioner argues that his trial counsel rendered ineffective

14  assistance because of his failure to challenge the jury's verdict.  Petitioner states that evidence

15  relevant to this claim was lost by his trial counsel and is no longer available.  The California

16  Superior Court explained the background to this claim and its ruling thereon as follows:

17                     After the verdict, petitioner states that Cingcon received
                       information from jurors after the trial that four jurors did not
18                     believe him to be guilty, but convicted him because he did not
                       prove his innocence.  He asserts that Cingcon should have
19                     challenged the jury's verdict.  (Pp. 31-32 of the attached pleading
                       paper petition.)  The court rejects this claim because he has not
20                     established that there was any admissible evidence as required by
                       Evidence Code section 1150 to challenge the jury's verdict and
21                     thereby obtain a new trial.  (See also People v. Von Villas (1992)

22

23             [7] Under California law the imposition of a restitution fine is "at the discretion of the court
        and commensurate with the seriousness of the offense" and requires no statement of formal
24      reasons on the record.  Cal. Penal Code § 1202.4 (b)(1); People v. Romero 167 Cal. App. 3d
        1148, 1156 (1985).  Unless there are "compelling and extraordinary reasons," the defendant's
25      "lack of assets" and "limited employment potential" are "not germane" to his or her ability to pay
        the fine. People v. McGhee, 197 Cal. App. 3d 710, 715  (1988).  In the absence of a contrary
26      showing, the court is entitled to presume the defendant will pay the restitution fine out of future
        earnings. People v. Frye, 21 Cal. App. 4th 1483, 1486-1487 (1994); Cal. Penal Code § 1202.4(d).

> 10 Cal.App.4th 201, 250-253 [unsworn statement of jury
> foreperson inadmissible to support claim of jury misconduct].)  He
> has not provided any direct evidence from a jury [sic] in the form
> of either an affidavit or declaration in support of his allegations.
> Furthermore, it is doubtful that such evidence would be admissible
> as it would constitute an attempt to challenge the mental processes
> that led to the verdict.  (People v. Grant (1985) 165 Cal.App.3d
> 496, 501.)

(Answer, Ex. 5 at 8.)

Evidence concerning the mental processes by which a juror arrived at his/her

verdict is inadmissible to test the validity of a verdict.  Tanner v. United States, 483 U.S. 107,

117 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury

deliberations from intrusive inquiry.").  On the other hand, jurors may testify regarding any

extraneous influence on their verdict.  Id. at 117; Traver v. Meshriy, 627 F.2d 934, 941 (9th Cir.

1980).  This distinction is embodied in Rule 606(b) of the Federal Rules of Evidence, which

provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror
> may not testify as to any matter or statement occurring during the
> course of the jury's deliberations or to the effect of anything upon
> his or any other juror's mind or emotions as influencing him to
> assent to or dissent from the verdict or indictment or concerning
> his mental processes in connection therewith, except that a juror
> may testify on the question whether extraneous prejudicial
> information was improperly brought to the jury's attention or
> whether any outside influence was improperly brought to bear
> upon any juror.  Nor may his affidavit or evidence of any statement
> by him concerning a matter about which he would be precluded
> from testifying be received for these purposes.[8]

_____

[8]  The Federal Rules of Evidence apply to federal habeas corpus proceedings to the extent
that the habeas statutes themselves provide no different rule of evidence.  Fed. R. Evid. 1101(e).
There is no habeas evidentiary rule on the subject.  See also Bibbins v. Dalsheim, 21 F.3d 13, 16-
17 (2d Cir. 1994) (applying Fed. R. Evid. 606(b) rather than state law in determining whether
evidence was admissible to impeach a state court verdict); Silagy v. Peters, 905 F.2d 986, 1008-
09 (7th Cir. 1990) (same); Stockton v. Commonwealth of Virginia, 852 F.2d 740, 743-44 (4th
Cir. 1988) (same); Bloom v. Vasquez, 840 F. Supp. 1362, 1377 n.23 (C.D. Cal 1993) (holding
that pursuant to Federal Rule of Evidence 1101(e), the Federal Rules of Evidence apply to federal
habeas cases), rev'd on other grounds by Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997).

1   This rule is intended to protect the jury's deliberative process by preventing challenges to a

2   verdict based on arguments, statements, discussions, mental and emotional reactions, votes, or

3   methods used in reaching a verdict.  See Fed. R. Evid. 606 Advisory Committee Notes;  In re

4   U.S. Financial Securities Litigation, 609 F.2d 411, 430 n.68 (9th Cir. 1979).  The values sought

5   to be promoted by Rule 606(b) include freedom of deliberation, stability and finality of verdicts,

6   and protection of jurors against annoyance and embarrassment.  McDonald v. Pless, 238 U.S.

7   264, 267-68 (1915).

8           Rule 606(b) creates two exceptions to the general rule prohibiting the use of juror

9   testimony to challenge a verdict: cases where the jury may have considered extraneous

10  information or may have been affected by outside influences.  See United States v. Navarro-

11  Garcia, 926 F.2d 818, 821 (9th Cir. 1991) ("Evidence not presented at trial, acquired through out-

12  of-court experiments or otherwise, is deemed 'extrinsic.'");  Marino v. Vasquez, 812 F.2d 499,

13  505-06 (9th Cir. 1987) (finding admissible as an "outside influence" information that a juror

14  consulted a dictionary to define the word "malice");  Gibson v. Clanon, 633 F.2d 851, 855 (9th

15  Cir. 1980).   In addition, some courts have allowed juror testimony to explain a clerical error in

16  the verdict.  See, e.g., Plummer v. Springfield Terminal Ry. Co., 5 F.3d 1, 3 (1st Cir. 1993).

17          In support of his claim in this regard, petitioner states that the defense investigator

18  asked four jurors why they voted to convict petitioner and they responded that petitioner had

19  failed to prove his innocence.  These statements may not be considered for the purpose of

20  challenging the jury verdict in this case because they do not fall within the stated exceptions to

21  Rule 606(b).  Such post-verdict statements do not demonstrate that the jury in petitioner's case

22  was exposed to extraneous evidence or outside information.  Neither do the statements concern

23  the issue of whether the verdict contains a clerical error.  Rather, the juror statements reflect

24  merely the discussions, reactions, or mental thought processes of the jurors.  The only use that

25  the testimony could serve would be to demonstrate that these discussions affected the

26  deliberative process.  Pursuant to Federal Rule of Evidence 606(b), such evidence is inadmissible

32

1   to impeach a verdict.  Accordingly, even if petitioner had been able to obtain juror affidavits

2   from his trial counsel, he would not be entitled to relief on this claim.  In short, petitioner's

3   counsel did not render ineffective assistance in failing to challenge the jury verdict on the basis of

4   the jurors' alleged post-verdict statements regarding their deliberative process.

5                          12.  Overheard Conversation

6           Petitioner also claims that his trial counsel rendered ineffective assistance because

7   of his failure to locate a potential witness who told police that she overheard two employees at a

8   Toys R Us store "talking about the incident/shooting at Nicky's Bar, she said that one female

9   (stated) that her boyfriends friend had shot the bartender at Nicky's."  (Pet. at 50.)  This claim,

10  based on triple hearsay, is far too speculative to warrant habeas relief.   Jones, 66 F.3d at 204.

11          For all of the reasons set forth above, petitioner is not entitled to relief on his

12  claim that his trial counsel rendered ineffective assistance.

13                          C.  Evidentiary Hearing

14          Petitioner requests an evidentiary hearing on his ineffective assistance of counsel

15  claim.  He represents that he requested an evidentiary hearing before the state courts but failed to

16  receive one.  He also states that, despite numerous requests from himself and his appellate

17  counsel, his trial counsel failed to turn over petitioner's case file which contained evidence of

18  counsel's trial strategy, the four juror interviews described above, and evidence of Juanita

19  Perez's identification of Salcedo, Jr. from the photo lineup.  Petitioner also recounts his

20  numerous efforts to obtain documentation from state agencies and the state courts of the photo

21  lineups utilized in this case, Juanita Perez's identification of Salcedo, Jr. at the photo lineup, and

22  the four juror affidavits.  (Pet. at 51-57.)

23          Pursuant to 28 U.S.C. § 2254(e)(2):

24          (e)(2) If the applicant has failed to develop the factual basis of a
            claim in State court proceedings, the court shall not hold an
25          evidentiary hearing on the claim unless the applicant shows that-

26                  (A) the claim relies on-

1               (I) a new rule of constitutional law, made retroactive to cases on
collateral review by the Supreme Court, that was previously
2               unavailable; or

3               (ii) a factual predicate that could not have been previously
discovered through the exercise of due diligence; and
4

5               (B) the facts underlying the claim would be sufficient to establish
by clear and convincing evidence that but for constitutional error,
6               no reasonable fact finder would have found the applicant guilty of
the underlying offense;

7   28 U.S.C. § 2254(e)(2).

8           Under this statutory scheme, a district court presented with a request for an

9 evidentiary hearing must first determine whether a factual basis exists in the record to support a

10 petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v.

11 Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Insyxiengmay v. Morgan, 403 F.3d

12 657, 669-70 (9th Cir. 2005).  Petitioner has not demonstrated that any additional facts need be

13 determined for a fair resolution of the merits of his ineffective assistance of counsel claim.  Thus,

14 petitioner has failed to overcome the initial hurdle identified above.

15           Even assuming arguendo that additional facts need be determined and that

16 petitioner did not receive a full hearing in state court despite his best efforts, petitioner has not

17 demonstrated that an evidentiary hearing is required.  A state habeas petitioner is entitled to an

18 evidentiary hearing on a claim only if he alleges "facts that, if proven, would entitled him to

19 relief." Turner v. Calderon, 281 F.3d 851, 890 (2002) (quoting Tapia v. Roe, 189 F.3d 1052,

20 1056 (9th Cir. 1999)) ("[e]ntitlement to an evidentiary hearing based on alleged ineffective

21 assistance, for example, requires a showing that if his allegations were proven at the evidentiary

22 hearing, deficient performance and prejudice would be established").  See also Townsend v.

23 Sain, 372 U.S. 293 (1963) (a defendant is entitled to a federal evidentiary hearing on his factual

24 allegations only if the merits of the factual dispute were not resolved in the state hearing, the state

25 factual determination is not fairly supported by the record as a whole, the fact-finding procedure

26 employed by the state court was not adequate to afford a full and fair hearing, there is a

1   substantial allegation of newly discovered evidence, the material facts were not adequately

2   developed at the state-court hearing, or for any reason it appears that the state trier of fact did not

3   afford the habeas applicant a full and fair fact hearing).  As discussed above, petitioner has failed

4   to demonstrate that he is entitled to relief on his claims in this court.  Further, this court has

5   determined that relief as to petitioner's claims should be denied on the merits because the state

6   court's decision was not contrary to, or an unreasonable application of, clearly established federal

7   law.  Accordingly, an evidentiary hearing is not warranted.  See Williams, 529 U.S. at 445.

8   IV.  Due Process Right to a Fair Trial

9                Petitioner's final claim is that his due process right to a fair trial was violated

10  when the trial judge allowed the wheelchair-bound victim to remain in the courtroom during

11  portions of petitioner's trial.  This argument was rejected by the California Court of Appeal in a

12  written decision on petitioner's direct appeal, and by the California Supreme Court without

13  comment in response to the petition for review.  (See Answer, Exs. 3, 4.)  The California Court

14  of Appeal described the background to this claim and the reasoning behind its decision as

15  follows:

16           The victim, Leyva, was the first witness to testify.  Afterwards he
             wanted to remain in the courtroom.  Defendant objected, noting
17           Leyva was friends with the other witnesses and his presence would
             make it harder for them to be neutral.  Leyva told the court he had
18           not seen any of the other witnesses since the shooting.  In response
             to the concern that Leyva's presence in his condition would create
19           sympathy, the district attorney noted Leyva had already testified for
             two hours, including testimony about the nature of his injuries.  A
20           doctor would also testify to Leyva's injuries.  The trial court ruled
             Leyva could stay for part of the trial, the decision would be made
21           day-to-day, but Leyva would be excluded at the end when his
             presence would have a greater impact.  Leyva was present
22           throughout the case-in-chief, but not towards the end as
             deliberations neared.

23
             Defendant contends the trial court erred in allowing the paralyzed
24           Leyva in his wheelchair to remain in the courtroom.  Under Penal
             Code section 1102.6 a crime victim has a right to be present during
25           criminal proceedings.  (footnote omitted).  The victim will be
             excluded only if there is a substantial probability that overriding
26           interests will be prejudiced.  (Pen. Code, § 1102.6, subd. (b).)

35

Defendant contends his right to a fair trial was prejudiced.  He claims Leyva's condition engendered sympathy and his presence may have influenced other witnesses.

There is nothing inherently inflammatory about the presence of a man in a wheelchair.  While Leyva's injuries and resulting paralysis were serious, the jury was well aware of these facts apart from his presence.  Both Leyva and a physician testified to his injuries.  Further, one of the issues the jury had to decide was the enhancement for great bodily injury causing paralysis.  Leyva's condition was thus an inescapable part of the case.  The trial court took steps to reduce the emotional impact of Leyva's presence by excluding him at the end of the trial, well before the jury began deliberations.

As to whether Leyva's presence would influence other witnesses, defendant failed to show a close association that would give rise to such influence.  Leyva knew many of the witnesses and considered some friends, but none was close enough to have seen him since the shooting.  Defendant failed to show Leyva's presence could sway their testimony.  Further, Leyva was unable to identify the shooter, so he had no crucial testimony to be corroborated.  Nor did it appear Leyva had any campaign against defendant. . .  As a crime victim, Leyva had a statutory right to be present, absent a showing of prejudice to overriding interests.  Defendant has failed to make that showing.  The trial court was correct in allowing him to stay through part of the trial.

(Opinion at 5-8.)

Petitioner argues that the jurors may have based their verdict on their "feelings of pity or sympathy for the victim" and not on the evidence at trial.  (Pet. at 75.)  He also argues that the victim's presence may have influenced the trial testimony of some of the witnesses.  For instance, he contends that witness Ed Ane, who originally identified petitioner as the shooter from a photo lineup but then told the defense investigator that he chose petitioner only because he knew petitioner had been in the bar, testified at trial that he saw petitioner with a weapon. (Id.)  Petitioner claims that the victim's presence in the courtroom directly influenced Ane's testimony in this regard.  Petitioner contends that the trial court should have permitted Leyva to watch the proceedings "by means of closed circuit television, videotape, or other means, so as to vindicate the victim's right to be present without imperiling petitioner's due process right to a fair trial."  (Id. at 77.)

1    Respondents argue that the state court's decision with respect to this claim is not

2    contrary to or an unreasonable application of federal law as determined by the United States

3    Supreme Court in <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991).  In <u>Payne</u>, the United States

4    Supreme Court held that the Eighth Amendment did not prohibit a capital sentencing jury from

5    considering "victim impact" evidence relating to the personal characteristics of the victim and the

6    emotional impact of the crime on the victim's family.  <u>Id.</u> at 817.  Specifically, the Supreme

7    Court concluded that "evidence and argument relating to the victim and the impact of the victim's

8    death on the victim's family" were admissible at a capital sentencing hearing (<u>id.</u> at 830 & n.2)

9    but that "information concerning a victim's family members' characterization of and opinions

10   about the crime, the defendant, and the appropriate sentence" could not be considered.  <u>Id.</u> at 835

11   n.1.  The Court also explained that victim impact evidence is subject to the constraints of the Due

12   Process Clause of the Fourteenth Amendment, which would prohibit evidence that "is so unduly

13   prejudicial that it renders the trial fundamentally unfair."  <u>See id.</u> at 825.  <u>See also</u> <u>Greer v.</u>

14   <u>Miller</u>, 483 U.S. 756, 765 (1987).[9]

15       The conclusion of the California Court of Appeal that the presence of victim

16   Leyva in the courtroom for part of petitioner's trial was not unduly prejudicial is not contrary to

17   federal law.  As noted by the trial court, the jurors were already familiar with Leyva's extensive

18   injuries.  Moreover, petitioner does not challenge any portion of Leyva's trial testimony during

19   which jurors were exposed to his physical condition resulting from the shooting.  The mere fact

20   that he was allowed to sit in the courtroom during parts of the trial was not so inflammatory that

21   it rendered petitioner's trial fundamentally unfair.  Finally, the trial court instructed the jury not

22

23        [9] Respondents' argument may miss the mark.  A defendant's courtroom demeanor is
     evidence that a jury may properly consider.  <u>Williams v. Calderon</u>, 52 F.3d 1465, 1483 (9th Cir.
     1995); <u>United States v. Schuler</u>, 813 F.2d 978, 981 n.3 (9th Cir. 1987); <u>see also</u> <u>Bates v. Lee</u>, 308

24   F.3d 411, 421 (4th Cir. 2002) (defendant's demeanor at trial was before the jury at all times and
     it was not improper for the prosecutor to comment on it in closing argument), <u>cert. denied</u>, ___

25   U.S. ___, 123 S. Ct. 2223 (2003).  It is not clear, however, that a crime victim's presence in the
     gallery during parts of a trial, as opposed to the victim's appearance on the witness stand, is

26   evidence.

1  to be swayed by any passion, prejudice, or undue sympathy for either side.  (CT at 121.)

2  Petitioner's jurors are presumed to have followed this instruction.  <u>Penry v. Johnson</u>, 532 U.S.

3  782, 799 (2001).  Petitioner has failed to show that his due process rights were violated by virtue

4  of the victim's presence in the courtroom.  Accordingly, petitioner is not entitled to relief on this

5  claim.

6        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ

7  of habeas corpus be denied.

8        These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: July 14, 2005.

17

18                                         DALE A. DROZD
                                          UNITED STATES MAGISTRATE JUDGE
19

20  DAD:8:hammo540.hc

21

22

23

24

25

26